IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
          Plaintiff,

          vs.                                    Case No. 16-10062-JTM

OMAR CANTERO MARTINEZ, *et al.*
          Defendants.

MEMORANDUM AND ORDER

***Motion to Dismiss***

Defendant Omar Cantero Martinez has moved to dismiss the indictment, alleging prosecutorial misconduct in the June 21, 2016 indictment of Diego Martinez, his brother, for making a false statement to the FBI. Specifically, the defendant argues that the indictment of his brother violates his constitutional right to compel the attendance of witnesses on his behalf and thus amounts to witness intimidation. He contends that his brother has indicated he would testify that he was with the defendants at the bar on June 19, 2015 where the incident began:

> They had a few drinks. Diego then left with a female friend of his. His brothers remained at the bar. A little while later, 3 Samolians [sic] claimed they were attacked by 3-4 Mexican males. Diego Martinez would testify that he did not participate in the fight and was not even present in the area when the fight occurred.

(Dkt. 47, at 4).

The Fifth and Sixth Amendments provide a criminal defendant the right to present a defense by compelling the attendance of favorable witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). This right may be infringed if the prosecution substantially interferes with a defense witness's decision to testify. *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (*per curiam*). *See also United States v. Golding*, 168 F.3d 700, 703 (4th Cir.1999) ("The authorities are uniform that threatening a witness with prosecution and comment about the absence of a witness who has a privilege not to testify are a violation of the Sixth Amendment right of a defendant to obtain witnesses in his favor.").

The defendant correctly notes the appropriate standard, under which he must "provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material." *United States v. Allen*. 603 F.3d 1202 (10th Cir. 2010) (citations omitted).

In *Allen*, the defendant complained about the government intimidating two potential witnesses, but, as the Tenth Circuit noted, the defendant's argument was short on details as to the two witnesses –

> Laurie Smith had been cooperating with the investigator but then was allegedly threatened by one of the government agents who interviewed her. Samantha Gloy had not been cooperating with the defense, but appellant suggests that she may also have been intimidated. We are not given any specifics about such alleged intimidation.

603 F.3d at 1211. The court in *Allen* concluded the defendant's claim failed on both prongs: "There is no hint as to what testimony these witnesses might have given, and no evidentiary support for the claim of misconduct." *Id*.

Here, at best, the defendant has supplied some indication that Diego Martinez would indeed provide exculpatory information, meeting the second prong of the test. He provides very little reason, however, for concluding that the first prong of the test has been met, for two reasons.

First, he has failed to show that the government has acted improperly. Government misconduct which interferes with the right to obtain witness testimony may take the form of threats of prosecution or other intimidating conduct. *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir.1988). On the other hand, merely informing a potential witness of the consequences of violating the law is insufficient to constitute a Sixth Amendment violation, even if the government's comments dissuade a witness from testifying. *See United States v. Hayward*, 6 F.3d 1241, 1257 (7th Cir.1997) ("There is nothing wrong with the government informing witnesses of the consequences of breaking the law.").

> In determining whether "the government actor's interference with a witness's decision to testify was 'substantial,'" we have examined whether the witness was actively discouraged from testifying "through threats of prosecution, intimidation, or coercive badgering." [*United States v. Serrano*, 406 F.3d 1208,] 1216 [(10th Cir. 2005)]. Conducting a "case-by-case" analysis, we have taken into account factors such as (1) whether the witness consulted with an independent lawyer before refusing to testify; (2) the degree and kind of warning made to the witness; and (3) whether evidence shows the prosecutor acted in bad faith. *Id.*; *see also United States v. Smith*, 997 F.2d 674, 679-80 (10th Cir.1993).

*United States v. Clark*, 284 Fed.Appx. 555, 557 (10th Cir. 2008).

The defendant in *Clark* was charged with assault, and gave notice that his minor brother might testify on his behalf. The government responded that it had not ruled out charging the brother, and asked the court to appoint an attorney on his behalf. The defendant argued this amounted to improper coercion which violated his Fifth and Sixth Amendment rights to obtain testimony on his behalf.

The defendant argued that the government lacked probable cause to charge the brother at the time that it gave the warning of potential prosecution. The government argued that the testimony of another witness that the brother was also guilty of assault provided probable cause. The Tenth Circuit noted that generally "probable cause is necessary before the government threatens a third party with prosecution in the context of plea negotiations, *United States v. Wright*, 43 F.3d 491, 498-500 (10th Cir.1994), [but] we have never extended this principle to the context of trial witnesses." 284 Fed.Appx. at 557. The court concluded that it need not address the issue of probable cause, finding that the defendant failed to show the brother's testimony would have been material and favorable.

Here, the defendant's argument fails as to the misconduct prong, because the government has made a showing of probable cause for charging Diego Martinez with making a false statement to the FBI – it did, after all, obtain an indictment from the grand jury on that charge. Moreover, the defendant has failed to show any substantial change in the government's treatment of Diego Martinez. That is, there is nothing to indicate that it had ever told him that he was immune, or that it was not going to

prosecute him for false statements, and then changed course only upon learning of his proposed testimony.

Rather, as indicated in the government's response to the Motion to Dismiss, the indictment of Diego for violating 18 U.S.C. § 1001 naturally arose after the FBI determined that the alibi he offered in his October, 2015, statement was false. The government obtained the indictment as the result of its criminal investigation and following contacts with Diego's counsel – without indication that Diego had been independently speaking with counsel for the defendant. The government represents, and there is no evidence to the contrary, that "[a]t no point in time did Diego Martinez's attorney make any reference to his client having spoken to the defense attorneys in this case, nor did he make any reference to his client having received a defense subpoena." (Dkt. 51, at 3). The government formally notified Diego that he was a target of a criminal investigation two weeks *before* Diego spoke with defense counsel.

Second, there still has been no showing that the government has actually *prevented* Diego Martinez from testifying. The defendant's motion does not indicate that his brother now refuses to testify. Rather, the motion merely indicates that "If the defense were to call Diego Martinez as a witness, the government will impeach his testimony with his current indictment." (Dkt. 57 at 4). All of the cases cited by the defendant involve claims that that the government's actions have caused a potential witness to refuse to testify. None of the cited cases have held that a due process violation arises when a witness is able to testify, but is simply subject to impeachment.
5

*Motion in Limine*

The government has filed a Motion in Limine which follows through on an issue first noted in its trial brief: it wishes to introduce portions of a recorded telephone call made by the defendant Omar Martinez while he was in the Ford County Jail. However, it does not want to introduce the entire call, and seeks to preemptively preclude the defendants from introducing other portions of the call. The government argues that the inculpatory parts of the call are admissible, nonhearsay statements of a party opponent, while any exculpatory statements are hearsay, and are not admissible under the "rule of completeness" as reflected in Fed.R.Evid. 106.

The government correctly notes that the general Rule 106 standard for admissibility of additional parts of a piece of evidence otherwise admitted was addressed in *United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010):

> "The purpose of Rule 106 is to prevent a party from misleading the jury by allowing into the record relevant portions of a writing or recorded statement which clarify or explain the part already received." *United States v. Moussaoui*, 382 F.3d 453, 481 (4th Cir.2004) (quotations omitted); *see also Echo Acceptance Corp.*, 267 F.3d at 1089 ("The rule of completeness … functions as a defensive shield against potentially misleading evidence proffered by an opposing party."). "The rule of completeness, however, does not necessarily require admission of [an entire statement, writing or recording.] Rather, only those portions which are 'relevant to an issue in the case' and necessary 'to clarify or explain the portion already received' need to be admitted." *Zamudio*, 1998 WL 166600, at *6 (quoting *United States v. Haddad*, 10 F.3d 1252, 1259 (7th Cir.1993)). "In determining whether a disputed portion of a statement must be admitted [under the rule of completeness], the trial court should consider whether '(1) it explains the admitted evidence, (2) places the admitted evidence in context, (3) avoids misleading the jury, and (4) insures fair and impartial understanding of the evidence.'" *Id.* (quoting *United States v. Li*, 55 F.3d 325, 330 (7th Cir.1995)).

The government also notes that *Lopez-Medina* favorably quoted an earlier observation in *United States v. Wright*, 826 F.2d 938, 946 (10th Cir. 1987), that "[i]t would be puerile to suggest that if any part of a statement is to be admitted the entire statement must be admitted."

Neither *Lopez-Medina* nor *Wright* supports a general exclusion of the transcript. In the former case, the government introduced as evidence the factual allocution of a co-defendant half-brother, and the defendant argued that the rule of completeness required the introduction of additional hearsay evidence that the government had agreed to seek a lower sentence based on substantial assistance. The trial court refused to permit the evidence, and the court of appeals found no abuse of discretion, stressing that the promise was unfulfilled and in any event would have misled the jury:

> The fact Lopez–Ahumado did not assist the government suggests the government's promise to seek a downward variance in exchange for such assistance was not the reason he pled guilty. And there is no reason to believe the government's promise altered the facts to which Lopez–Ahumado admitted. Admitting the government's promise would not have ensured a fair and impartial understanding of the evidence which is the purpose of the rule of completeness. Actually, it would have had quite the opposite effect—misleading the jury by suggesting the government's offer motivated Lopez–Ahumado's guilty plea, when, in fact, it did not.

596 F.3d at 736-37.

The rule of completeness also did not apply in *Wright*, which involved a diary kept by an associate of the defendant. The trial court determined that some entries in the diary were admissible under the residual hearsay exception. Fed.R.Evid. 804(b)(5), because "the diary was kept with sufficient regularity[,] {t]here was no apparent reason for falsification of the entries[, and] the diary was self-incriminatory and the entries

introduced were corroborated by other testimony." 826 F.2d at 946. The entries which the defendants sought to introduce, however, "were not demonstrably relevant to the issues at trial." *Id*.

The present matter is unlike the cited cases because the subject evidence is simply one telephone conversation. Out of the entire conversation, which runs to 12 pages in transcript form, the government seeks to use just five snippets from two pages of the transcript (Dkt. 49, at 2). Those portions indicate that the alleged assault occurred in front of Torino's grocery store, not the bar where the confrontation first began, that the Somalis did not start the fight, that the defendant knocked someone down, and that he cut someone.

Certainly there is much in the transcript that is not directly relevant to any of the issues in the case. But there are also many comments by the defendant which are directly relevant, and which do give context to the portions of transcript that the government wants to use. During the course of the conversation, the defendant states:

> (Somalis) told many lies and said that we did it and we (cut) them for no reason. And that's not how it happened… I don't know what the (Somalis) did to him, or if one had stolen something from him or what. And then I hit one and knocked him down, he fell to the floor. And I said, let's go but (Neco) wanted to continue fighting. And that's when I was about to leave, and all of a sudden, a lot of them came out from the front. One of them threw a kick at me, not so big but he threw me off to the floor. And they were hitting me all over. They were around four, I think. And then I took the bottle from underneath – I took the bottle I was carrying, and I just (grabbed) anyone. And that's when they took it away from me.
>
> But in any case, uh, the (Somalis) that I have here in the paperwork, and the ones I stabbed, they weren't outside but came out all of a sudden when someone went over to ask for help. And that's when they came out

>because they say, that there were three of us. From the ones I grabbed. That it was the three of us. But they don't know, they simply invented this. But they-- they weren't outside. And that's why it was one or two (Somalis) that jumped me and (Neco), like around 5 to him and 5 to me. But, yeah, in any case, it was self-defense but I don't know if they have that law here in (Rush) or in Kansas.
>
>Maybe go to (Torino's) and check if they've got cameras because all that happened with me was self-defense. They jumped me first, all the (Somalis) and in order to get them off me, the only way I found was (cutting) them. But it wasn't like it was too bad, either, I hurt one around the (belly) and the other one I cut him on the arm, but that was all. It wasn't too bad….

Thus, the defendant Martinez indicates in the course of the conversation that he happened on the scene after the other defendant, Armando Sotelo, and that he wasn't sure what the actual fight was about. He tried to get Sotelo to leave. The Somalis started the physical altercation, according to the defendant, and he used the bottle as a weapon only after other Somalis arrived from inside the grocery store, and he and Sotelo were heavily outnumbered. Martinez believed the Somalis were lying or exaggerating, and expressed a further belief that video cameras would show that the defendants acted in self-defense.

The court finds that it would be misleading to introduce only the statements selected by the government without that additional context.

9

IT IS ACCORDINGLY ORDERED this 18th day of August, 2016, that the defendant's Motion to Dismiss (Dkt. 47) and the government's Motion in Limine (Dkt. 48) are denied.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE
